## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**DORLENE WILLIAMS,**

**Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

**Defendant.**

**No. 15 C 7011**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Dorlene Williams filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1.   Is the claimant presently unemployed?

2.   Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work- related activities that is expected to last at least 12 months?

3.   Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4.   Is the claimant unable to perform his or her former occupation?

5.   Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on February 11, 2013, alleging that she became disabled on February 1, 2013. (R. at 40, 198–204). Plaintiff claimed that she suffered from 14 disorders, including pulmonary hypertension, memory problems, fatigue, dyspnea (shortness of breath), asthma, syncope (a temporary loss of consciousness), lack of concentration, cardiac arrhythmia, Raynaud's disease (numbness or coldness in the extremities), a heart murmur, a heart valve disorder, a herniated disc, and bursitis of the hips. (*Id*. at 133). The application was denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id*. at 134–37, 144–67, 148–49). On December 19, 2014, Plaintiff, who was represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id*. at 58–98). The ALJ also heard testimony from vocational expert (VE) Ronald Malik. (*Id*.).

The ALJ denied Plaintiff's request for benefits in a January 7, 2015 written decision. (R. at 40–51). Applying the five-step sequential evaluation process, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 1, 2013. (*Id*. at 42). At step two, the ALJ found that Plaintiff's severe impairments included a lumbar spine disorder, degenerative disc disease, bursitis, asthma, and Raynaud's disease. The ALJ also concluded that Plaintiff suffered from several nonsevere impairments. These included a right toe bunion, visual impairments, arterial and pulmonary hypertension, premature ventricular contractions, bipolar disorder, obesity, dyslipidemia, depression, and post-

traumatic stress disorder (PTSD). (*Id.*). At step three, none of these impairments met or medically equaled, either singly or in combination, the severity of the listings enumerated in the regulations. (*Id.* at 43–44). The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[2] and determined that Plaintiff has the RFC to perform sedentary work

> except that she can occasionally push or pull with the upper extremities, climb ramps or stairs and stoop. She should never climb ladders, ropes or scaffolds, balance, crouch, kneel or crawl. [Plaintiff] is limited to frequent reaching (including overhead), handling and fingering. She should avoid concentrated exposure to environmental irritants such a fumes, odors, dusts, and gases, poorly ventilated areas and chemicals.

(*Id.* at 46). Based on this RFC and the VE's testimony, the ALJ determined at step four that Plaintiff was able to perform her past relevant work as an office manager. (*Id.* at 50). Accordingly, the ALJ did not proceed to step five and concluded that Plaintiff was not under a disability from the alleged onset date through the date of his decision. (*Id.* at 50–51).

Plaintiff filed a timely request for review of the ALJ's decision. (R. at 24). As part of that request, Plaintiff submitted evidence that she claimed was new and material. (*Id.* at 19–36). The Appeals Council denied her request on June 24, 2015. (*Id.* at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the Commissioner's final decision. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id*. The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id*. (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotes and citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal quotes and citation omitted). "This deferential

standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff stopped working in January 2013 after being employed for 18 years as an office manager in a medical clinic. (R. at 63). She stated at the hearing that she was unable to continue working because the pain that she experienced in her back and hips made it difficult for her to concentrate on what she was doing or to remember what she was reading. (*Id*. at 64–65).

Plaintiff had sought medical treatment for these conditions long before her last employment date. Some records suggest that she received epidural steroid injections in her lower back as early as 1994. (R. at 799). A November 2004 MRI of Plaintiff's lumbar spine revealed a left-sided disc herniation and degenerative disc bulging at L5-S1. (*Id*. at 412). A CT scan performed the same month suggested moderate central canal stenosis and moderate to severe bilateral foraminal stenosis. (*Id*. at 788). An epidural steroid injection was administered to lessen Plaintiff's discomfort on November 23, 2004. (*Id*. at 463). Although Plaintiff complained of back

pain during treatment sessions for other conditions, the next treatment note concerning her back pain was given on October 27, 2014. A recent MRI showed that she had degenerative disc disease, a disc bulge at L5-S1, and a small diffuse bulge at L4-L5. (*Id.* at 788). Orthopedist Dr. Anis Mekhail diagnosed her with lumbar radiculopathy and gave her an epidural injection. (*Id.* at 794, 797). He then referred Plaintiff to pain specialist Dr. Neema Bayran. (*Id.* at 799). Dr. Bayran noted full lower-extremity extension but also found that Plaintiff had no deep tendon reflexes. She recommended that Plaintiff receive additional injections at the L4-L5 and L5-S1 levels. (*Id.* at 801).

Records submitted for the first time to the Appeals Council show that Plaintiff received those injections at some unspecified date. (R. at 32). The relief they gave lasted less than one week. (*Id.*). Dr. Mekhail noted on January 26, 2015, that Plaintiff was experiencing numbness and tingling in her feet and diagnosed her with diabetic peripheral neuropathy.[3] (*Id.* at 33). A subsequent EMG study confirmed that diagnosis. (*Id.* at 28, 31). On February 20, 2015, she also received a lumbar medial branch nerve block at L3, L4, and L5 on the right side. (*Id.* at 21–22). Dr. Bayran noted three days later that Plaintiff experienced relief for four to five hours after the procedure but it gradually returned to its baseline level. (*Id.* at 20). Dr. Bayran thought that Plaintiff should receive only conservative care. (*Id.* at 23, 28). She

---

[3] Plaintiff had only been diagnosed as pre-diabetic at the time of the ALJ's decision. (R. at 744). Plaintiff's treating physician Dr. Mala Hajat prescribed metformin to help control her condition. Metformin is a diabetes medication that helps controls blood sugar levels. <http://www.drugs.com/metformin.html> Dr. Mekhail noted that the EMG study suggested that Plaintiff's neuropathy was the result of her pre-diabetic condition. (R. at 31).

therefore administered a radiofrequency ablation of the lumbar medial branches that gave Plaintiff significant pain relief for the first two weeks. (*Id*. at 8). The pain then returned in full on the left side, with radiating symptoms through the left hip and calf. Dr. Bayran recommended further epidural injections. (*Id*.).

Plaintiff also experienced ongoing pain in her hips. A May 2004 MRI was administered to evaluate her complaints, but it revealed a normal left hip. (R. at 413). A June 2007 x-ray showed a cyst in the femoral neck of the left hip, with mild degenerative changes and space narrowing. (*Id*. at 409). A follow-up MRI for Plaintiff's hip was performed in December 2012 by Dr. Bruce Dolitsky. It revealed bilateral trochanteric bursitis, which was treated with a steroid injection. (*Id*. at 558). Dr. Dolitsky gave Plaintiff another injection in her hips in February 2013. (*Id*. at 556, 562). An exam in June of that year showed that Plaintiff had mild pain with a normal range of motion and a normal walking posture. (*Id*. at 640). She had an additional x-ray study of the hip done in February 2014 that showed normal hips with no degenerative changes. (*Id*. at 746). Nabumetone and tramadol were both administered to relieve her pain. (*Id*. at 772).

Although Plaintiff's orthopedic complaints were largely limited to the hips and back, she also experienced pain in her fingers. Treating physician Dr. Hajat noted in March 2011 that Plaintiff had been experiencing numbness in her left hand and the two medial fingers for the past two months. She diagnosed a possible case of carpal tunnel syndrome. (R. at 580). Plaintiff then saw neurologist Dr. Anthony Stephens. He noted that an EMG study had shown evidence of ulnar neuropathy at

the elbow but found that it did not require further treatment other than therapy. (*Id.* at 325). Nevertheless, Plaintiff's pain continued, and she received a steroid injection in her left middle finger at some unspecified point by July 2013. (*Id.* at 609). Records concerning her other medical consultations record ongoing complaints of finger pain throughout 2013. (*Id.* at 638, 679).

Plaintiff claimed in a written April 2013 Function Report that her joint pain, particularly her back discomfort, affects almost all of her functional abilities except hearing and getting along with others. (R. at 248). She is unable to lift more than ten pounds or to walk more than five to ten minutes at a time. Even then, she must rest for five to ten minutes before resuming her activities. (*Id.*). Plaintiff further claimed at the administrative hearing that her back pain had become worse over time. (*Id.* at 67–68). She now experiences back and hip pain on a daily basis. (*Id.* at 86). In addition, her legs became painful and her right foot began to go numb four months prior to the August 2014 hearing. (*Id.* at 86–87). The pain is so great that she must lie down in a reclining chair for four or five hours during the day and nap for up to an hour-and-a-half daily. (*Id.* at 88–89). Plaintiff explained to the ALJ that she would be unable to carry out her former work because she could no longer sit for the required time. (*Id.* at 88). The pain in her fingers, which Plaintiff attributed to Raynaud's disease, would also prevent her from typing or writing for the five hours she used to carry out those tasks at her prior job. (*Id.* at 76, 89). Plaintiff expressed particular concern over ability to handle small objects. (*Id.* at 76). Repetitive move-

ments like writing for more than 20 minutes or even stirring something while cooking can bring on serious pain. (*Id*. at 76–77).

Plaintiff also claimed at the hearing that her multiple joint problems significantly limited her ability to carry out many activities of daily living (ADLs). She described her day as limited to walking to the end of the block and back, watching television, napping, and doing light dusting and housekeeping. (R. at 82). She only uses paper plates and utensils. Her boyfriend prepares most meals and walks the dog. (*Id*. at 81–82). An October 2013 Function Report states that Plaintiff can only do light laundry once a week. (*Id*. at 278). She goes outside twice a week, mostly to visit her mother, to keep a doctor's appointment, or to go to the grocery store for 15 to 20 minutes. (*Id*. at 279).

In addition to pain in her back and joints, Plaintiff also claims that she is impaired by episodes of dizziness and syncope. She was treated for dizzy spells as early as August 1999, when Dr. Arvind Kumar found that an MRI of Plaintiff's brain was normal. (R. at 304, 310–11). A tilt-table test, which assesses the causes of a fainting episode, itself triggered an episode of syncope in July 1999. (*Id*. at 315, 520). Dr. Kumar suggested that Plaintiff's light headedness might be due to orthostatic hypotension but noted that medication helped to relieve her symptoms. (*Id*. at 310–11). Neurologist Dr. Anthony Stephens was also unable to identify a specific cause for the syncope. (*Id*. at 326). Two years later, Plaintiff appeared at South Suburban Hospital in June 2001 with complaints of light headedness, which the examining physician attributed to stress. (*Id*. at 318–29). Dr. Stephens reached the

same conclusions two months later, when he evaluated Plaintiff for sensations of electrical shocks in her head and hands. (*Id*. at 324).

The record does not indicate the frequency of Plaintiff's light headedness. In November 2011, however, she sought emergency treatment for a syncope episode and told the treating physician that her symptoms had become more frequent and more severe. (R. at 328). She was diagnosed with an unspecified myopathy and released without further treatment. (*Id*. at 329). Plaintiff told the ALJ at the hearing that she had not experienced syncope for several years. Nevertheless, she claimed to be hesitant to go out for a walk out of fear that she might fall. (*Id*. at 86).

As noted, Dr. Kumar thought that Plaintiff's condition might be linked to her blood pressure, which was only one of several cardiac conditions for which Plaintiff sought treatment. She was already being treated with medication for mildly elevated blood pressure at the time of Dr. Kumar's evaluation in 1999. (R. at 318). Dr. Hajat also found that she suffered from a mitral valve prolapse, though later testing found no evidence for such a condition. (*Id*. at 316, 513). Later studies in 2011 revealed a severe tricuspid regurgitation.[4] (*Id*. at 497, 499). Plaintiff also complained of shortness of breath upon exertion. (*Id*. at 497–98). Cardiologist Dr. Kurt Erickson ordered a CT scan of her chest and increased the dosage of Plaintiff's medication to help control her blood pressure. (*Id*.). The scan showed an abnormal right subclavian artery but no acute pulmonary disease. (*Id*. at 496). An echocardiogram report

---

[4] Tricuspid regurgitation involves the backward flow of blood between chambers of the heart due to a defect in the tricuspid valve. Symptoms can include weakness and fatigue. <https://medlineplus.gov/ency/article/00169.htm>

submitted for the first time to the Appeals Council showed only a mild regurgitation in the mitral and tricuspid valves but with increased pulmonary artery pressure compared to the assessment that Dr. Erickson had made in 2011. (*Id.* at 10, 494).

The stress that the 2001 emergency room notes suggested is also recorded in the notes of treating physician Dr. Hajat. She diagnosed anxiety in Plaintiff as early as February 2000. (R. at 589). She prescribed the antidepressant medication Paxil in 2001 after noting that Plaintiff was also experiencing fatigue. (*Id.* at 587). Dr. Hajat's notes suggest that she prescribed Paxil and other psychotropic medications on a sporadic basis over several years. In May 2007, Dr. Hajat added the antidepressant Elavil to her prescription of Paxil and also prescribed the anti-anxiety medication ativan. (*Id.* 585). Both anxiety and depression were formally diagnosed in July 2013, when Dr. Hajat noted that Plaintiff was experiencing increased attacks of anxiety. (*Id.* at 609–10). Paxil and the anti-anxiety drug lorazepam were given in February 2014 because Plaintiff was "very nervous and anxious." (*Id.* at 742). Such anxiety attacks were also noted as being "very frequent" as of May 2014, though Dr. Hajat stated that they were often controlled with medication. (*Id.* at 761).

Plaintiff expanded on this line of evidence at the hearing by telling the ALJ that her anxiety and depression cause significant levels of fatigue due to the lorazepam that Dr. Hajat prescribed. (R. at 80). Dr. Hajat's treatment notes show that Plaintiff complained of fatigue from 1998 through 2014, though Plaintiff was not always taking lorazepam during that period. (*Id.* at 587, 589, 592, 609, 742). Plaintiff described

her depression and anxiety as "severe," though she admitted that Paxil and loraze-pam helped to ease their symptoms. (*Id*. at 80). Even with medication, however, Plaintiff tries to avoid stress because she is afraid that her pulmonary hypertension will lead to her sudden death. (*Id*. at 249). She made the same claim in an October 2013 Function Report, stating that she frequently thinks that "I will drop dead sud-denly and not make it to the hospital in time." (*Id*. at 282). Plaintiff also explained to the ALJ that she attributed what she described as increased memory loss to her ongoing anxiety problems. (*Id*. at 69).

In addition to these records, scattered treatment notes document Plaintiff's other impairments. Elevated levels of antinuclear antibodies (ANA) indicated mild Ray-naud's disease in May 2011, although another ANA test in 2014 was negative. (R. at 460–61, 751). Plaintiff also expressed strong concern over her vision at the hearing. She told the ALJ that she had experienced blurry vision around the time that she stopped working in 2013. (*Id*. at 70). Plaintiff's vision requires her to read things multiple times in order to grasp their content, and she suffers from poor eyesight every day. (*Id*. at 70–72). She can read for a while without problems, but her vision quickly becomes too blurry to continue. (*Id*. at 72). Looking at objects also poses problems. Plaintiff claimed that she was able to look at something for only two to three minutes before losing focus. (*Id*. at 73). Her vision remains blurry throughout the day until she goes to bed in the evening. (*Id*.). Plaintiff's treating optometrist diagnosed her as a glaucoma suspect with hypertensive retinopathy and Fuchs dys-

trophy.[5] (*Id*. at 718, 739). Consulting ophthalmologist Dr. David Hillman confirmed diagnoses of Fuchs dystrophy and pre-glaucoma on December 20, 2013. He assessed her vision as 20/30 with corrective lenses. (*Id*. at 726–27).

Two other experts examined Plaintiff at the request of the Social Security Administration and provided reports to the ALJ. Internal medicine specialist Dr. M.S. Patil saw her on May 14, 2013. He noted that she was mildly obese but had a full range of motion in all of her joints. (R. at 572). Plaintiff's blood pressure was normal, but Dr. Patil noted a soft systolic murmur in her heart. (*Id*. at 573). She had no difficulties with fine and gross manipulation in either hand. (*Id*. at 572). Dr. Patil assessed her eyesight as 20/25. (*Id*. at 571).

Clinical psychologist Dr. Jeffrey Karr examined Plaintiff on May 1, 2013 concerning her complaints of depression and anxiety. Plaintiff told Dr. Karr that she did not have any friends other than the boyfriend who lived with her, that she no longer engages in meaningful social activities, and that most of her days are spent resting or watching television. (R. at 565). Plaintiff explained that she had begun treatment for her depression at the age of 19, when she was first prescribed Elavil. (*Id*. at 566). She attributed her history of depression to sexual and physical abuse by family members and a former husband, as well as the ongoing stress created by her health problems. (*Id*.). Dr. Karr found that Plaintiff could give serial 7's correctly and could repeat six digits forwards and four backwards. (*Id*. at 567). He noted

---

[5] Fuchs dystrophy is an inherited disease in which the cells lining the inner surface of the cornea slowly begin to die. It can cause eye sensitivity, blurred vision, and worsening vision during the day. https://medlineplus.gov/ency/article/007295.htm.

that Plaintiff was dysphoric and tearful, though she showed no obvious cognitive problem or physical distress. (*Id*. at 566). Based on these observations, and having noted that her "affect was congruent" with them, Dr. Karr diagnosed Plaintiff as suffering from PTSD and a major depressive disorder. (*Id*. at 566–67).

# V. DISCUSSION

Plaintiff argues that the Appeals Council erred by declining to incorporate into the administrative record several new medical reports that she submitted for the first time to the Council. Plaintiff also claims that the ALJ erred by (1) incorrectly analyzing the listing issue at step three, (2) improperly assessing her credibility, (3) and failing to provide a correct evaluation of her RFC. As part of the last claim, Plaintiff contends that the ALJ improperly assessed the weights that should be given to the reports of her treating physician Dr. Hajat and consulting psychologist Dr. Karr.

## A. The Appeals Council Did Not Err

Plaintiff submitted several medical records to the Appeals Council concerning tests that the ALJ had not seen before he issued the January 7, 2015 written decision. The Appeals Council declined to consider this evidence on the ground that it "is about a later time. Therefore it does not affect the decision about whether you were disabled beginning on or before January 7, 2015." (R. at 2). Plaintiff argues that one of the medical reports she provided—a January 27, 2015 EMG study carried out at Parkview Musculoskeletal Institute—contained new and material information that the Appeals Council was obligated to consider. The study was conduct-

ed by Dr. Russell Glantz to assess a possible distal neuropathy related to Plaintiff's complaints of numbness and tingling in her feet. Dr. Glantz concluded that Plaintiff was a "mild diabetic" and that she suffered from a peripheral neuropathy that was "presumably related to diabetes." (*Id*. at 27–28). He also determined that Plaintiff had a mild L5-S1 radicular process. (*Id*.).

The Appeals Council is required to evaluate additional evidence when it is (1) new, (2) material, and (3) relevant to the claimant's condition on or before the date of an ALJ's hearing decision. 20 C.F.R. §404.970(b); *see Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989). The evidence is incorporated into the administrative record if these conditions are met, and the Council engages in a *de novo* review if the newly-submitted material shows that the ALJ's decision is "contrary to the weight of the evidence." 20 C.F.R. § 404.970(b).

Plaintiff's post-hearing evidence qualifies as "new" under § 405(g) because it involves tests that were performed only after the ALJ issued his January 7, 2015 decision. *See Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (explaining that evidence is new if it was "not in existence or available to the claimant at the time of the administrative hearing."). The Appeals Council erred, however, in concluding that this new evidence does not relate back to Plaintiff's condition during her disability period. The EMG study was performed to assess the causes of Plaintiff's back and hip pain, as well as numbness and tingling in her feet. The Appeals Council appears to have thought that these symptoms involved conditions that were not present at an earlier point. In reality, Plaintiff had described the same symptoms on

numerous occasions before the ALJ issued his decision. The disorders of diabetes and radiculopathy that gave rise to Plaintiff's complaints were also not entirely new. Treating physician Dr. Hajat had already assessed Plaintiff as being pre-diabetic in February 2014 and prescribed medication to treat it. (R. at 743). Dr. Mekhail diagnosed Plaintiff with a lumbar radiculopathy on November 13, 2014. (*Id*. at 794).

Citing *Schmidt v. Barnhart*, 395 F.3d 737 (7th Cir. 2005), the Commissioner claims that the Appeals Council properly rejected Plaintiff's new evidence because it post-dated the ALJ's decision. In *Schmidt*, however, the new evidence given to the Appeals Council reflected treatment that was administered to the claimant between one and three years after the ALJ's decision. *Schmidt*, 395 F.3d at 741–42. Plaintiff's new evidence only post-dated the January 7, 2015 decision by three weeks. *Schmidt* did not find that post-hearing evidence could never be considered by the Appeals Council; it only held that the evidence at issue was too removed from the claimant's condition during the disability period to be relevant. *See id*. at 742 ("None of the proffered evidence speaks to Schmidt's condition as it existed at or prior to the time of the administrative hearing."). The brief period involved in this case, combined with the continuity between Plaintiff's pre-hearing and post-hearing symptoms and diagnoses, creates a nexus between the EMG study and the disability period that contradicts the Appeals Council's finding.

That does not automatically mean, however, that Plaintiff's new evidence is material under § 405(g) as she claims. Materiality and relevance constitute distinct

statutory requirements that must both be satisfied before the Appeals Council will consider the newly-submitted evidence. The regulations make that point clear by stating that "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). A claimant must therefore show that her evidence is new, material, *and* relevant. *See Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015) (stating that evidence must meet the regulation's triple requirement that it be new, material, and time relevant); *Perkins*, 107 F.3d at 1294 (finding that the Appeals Council determines whether material is new and material only when it "has assured itself that the proffered new material relates to the appropriate time period").

New evidence is material under § 405(g) if "there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered[.]" *Perkins*, 107 F.3d at 1296; *see also Schmidt*, 395 F.3d at 742; *Foster v. Halter*, 279 F.3d 348, 357 (7th Cir. 2001). There is little possibility, much less a reasonable probability, that Plaintiff's new evidence would have led to such a result if the ALJ had seen it. The ALJ might have reached a new finding if the study indicated that Plaintiff's limitations were greater than he thought. But Plaintiff's new evidence does not assess any restrictions or say anything about the degree of pain or numbness that she experienced. The fact that Dr. Glantz diagnosed Plaintiff with a lumbar radiculopathy and a peripheral neuropathy is unavailing. The ALJ already knew about Plaintiff's radiculopathy from Dr. Mikhail; he also knew that Plaintiff

was pre-diabetic and had complained about pain and numbness in her feet. Without showing that these conditions posed greater restrictions than the ALJ assessed, the study does not support Plaintiff's claim that the Appeals Council erred by declining to consider the EMG study.

## B. Listing Analysis

At step three of the sequential disability analysis, the ALJ considers whether a claimant's disorders meet or medically equal one of the impairments found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The step three determination is a medical decision that requires the ALJ to consider a medical expert's opinion. *Id.* at 370. Part of the ALJ's task at step three is also to consider the aggregate effects of a claimant's impairments, including those that are not severe standing alone. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011).

The ALJ in this case found that Plaintiff's impairments did not meet or equal listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 2.02 (loss of visual acuity), and 3.03 (asthma). (R. at 44). Plaintiff does not contend that the ALJ should have considered other listings or that he failed to discuss a listing in sufficient detail. She argues instead that the ALJ did not assess whether the combination of her impairments met or equaled a listing. To support her argument, Plaintiff

cites a litany of disorders that she claims the ALJ should have considered, including a lumbar spine impairment, bursitis, asthma, Raynaud's disease, bipolar disorder, degenerative disc disease, bunions, hypertensive retinopathy, glaucoma, Fuch's dystrophy, dry eye syndrome, arterial and pulmonary hypertension, premature ventricular contractions, obesity, depression, insomnia, PTSD, ulnar neuropathy, fatigue, dizziness, and syncope.[6]

This line of reasoning fails on multiple grounds. Plaintiff does not state what listing the ALJ should have considered in light of the multiple disorders that she names. Nor does Plaintiff acknowledge that the ALJ did not leave the issue unaddressed. Using familiar boilerplate language, he said that he had accounted for the combined effect of Plaintiff's disorders but that no "impairment or combination of impairments" met or equaled a listing. (R. at 43). That is ordinarily all that is required to satisfy an ALJ's step-three obligation when a claimant fails to identify what listing the combined effect of her impairments meets or equals. *See Getch*, 539 F.3d at 483; *Wurst v. Astrue*, 866 F. Supp. 2d 951, 961 (N.D. Ill. 2012) (finding that similar boilerplate language, combined with the claimant's failure to identify what listing is at issue, is not erroneous). It is not true, moreover, that the ALJ failed to discuss most of the conditions that Plaintiff cites. The body of the ALJ's decision addresses Plaintiff's eye condition, back pain, hypertension, obesity, Raynaud's disease, depression, fatigue, and dizziness. (R. at 44–48). Much of this discussion came

---

[6] The ALJ did not find the last four of these disorders to be severe or non-severe impairments at step two. (R. at 42). He was therefore not obligated to evaluate them at step three.

after the ALJ announced his step three finding, but an ALJ does not err when evidence relevant to one step in the sequential analysis is addressed at another stage. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (explaining that evidence discussed as part of the RFC assessment provides the evidence needed at step three).

More importantly, the ALJ did not fail to discuss the combined impact of Plaintiff's impairments. Plaintiff's counsel claimed at the administrative hearing that she met listing 14.02 (systemic lupus erythematosus) when all of her symptoms were considered as a whole. The ALJ addressed that possibility by providing a detailed analysis of listing 14.02 in his decision. (R. at 44). He identified Raynaud's disease, fatigue, arterial hypertension, and pulmonary hypertension and explained that Plaintiff did not demonstrate any organ impairment, severe fatigue, fever, malaise, or weight loss—all of which are identified in the listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.02. He also cited Plaintiff's treatment records, the listing's requirements, and the absence of evidence that Plaintiff had complained to her doctors about symptoms that are relevant to lupus. (R. at 44). Plaintiff has not pointed to any part of the record that the ALJ should have considered concerning listing 14.02 or explained why the ALJ's reasoning is incorrect. Thus she has failed to show why substantial evidence does not support the ALJ's listing decision. *See Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988) (upholding an ALJ's step three finding when the plaintiff fails to present contradictory evidence); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

## C. The ALJ Incorrectly Assessed Plaintiff's Credibility

The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." Social Security Ruling (SSR) 16-3p, at *2.[7] "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symp-

---

[7] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); see 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

toms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like former 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d

556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

The ALJ found that Plaintiff's statements about the intensity and persistence of her symptoms were "not entirely credible for the reasons explained" in his decision. (R. at 45). Plaintiff argues that conclusion requires remand on three grounds. First, she claims that the ALJ improperly failed to consider her persistence in pursuing medical care to treat her pain. An ALJ is always required to consider the degree to which a claimant has sought medical treatment for her impairments when assessing the credibility of her statements. "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications . . . or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p, at *8; *see Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (noting that a claimant is unlikely to undergo extensive treatment for conditions that are not troubling).

The record shows that Plaintiff underwent multiple tests, consultations, and steroid injections for her pain. Far from overlooking them as Plaintiff claims, the ALJ discussed her treatment history at length and found that it supported much of what she said about her back and hip pain. (R. at 48) ("The claimant's complaints of pain are consistent with the medical evidence and pose significant additional non-

exertional limitations to the extent stated in the above [RFC].""). Indeed, the ALJ relied on this line of evidence to reject the state-agency experts' finding that Plaintiff could work at the medium exertional level. He found instead that she could perform sedentary work. Plaintiff can only show that the ALJ erred by explaining why he should have thought that even greater restrictions were in order in light of her treatment history. Despite that, she does not cite any evidence that the ALJ overlooked or explain how the ALJ should have accounted for her treatment history differently.

Second, Plaintiff argues that the ALJ failed to build a logical bridge between the record and his conclusion that she was not credible about her complaints of dizziness, syncope, and fatigue. That claim overlooks that Plaintiff told the ALJ that she had not experienced an episode of syncope for two to three years at the time of the December 2014 hearing. (R. at 47, 85). That encompassed her entire disability period. The ALJ noted that testimony in his decision and properly discounted Plaintiff's claim that dizziness and fainting spells prevented her from working.

The ALJ's discussion of fatigue presents a different picture. He said that Plaintiff's testimony was not believable because "no physician has specifically addressed this symptom nor have they [sic] noted any clinical findings that she is ill appearing, disoriented or lacking of alertness." (R. at 47–48). Several problems accompany this claim that the ALJ failed to consider. It is not true that no doctor had addressed Plaintiff's fatigue. Plaintiff consulted her treating physician Dr. Hajat off and on for this problem for 16 years, and Dr. Hajat's treatment notes show that she

complained of fatigue from 1998 through 2014. (*Id*. at 587 ("very tired"), 589, 592, 609 ("excessive fatigue"), 742 ("drowsy and fatigued")). The treating doctor's report also addressed Plaintiff's lack of alertness, at least to some degree, by stating that she experienced "lack of concentration and fatigue." (*Id*. at 606). As for the absence of other "clinical findings," the ALJ never explained why it was necessary for the objective record to contain the observations he claimed were lacking. An individual can be fatigued without being disoriented to time or space and without having a doctor comment that she looks bad. Moreover, the fact that the record did not contain such a note is not, in itself, a basis for doubting Plaintiff's credibility. The objective record does not have to substantiate everything a claimant states in order for her to be credible. *See Villano*, 556 F.3d at 562 ("Furthermore, the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it.").

Social Security Ruling 16-3p requires an ALJ to consider a claimant's ADLs as well as the objective record when evaluating her credibility. Plaintiff told the ALJ at the hearing that she needs to nap for one to one-and-a-half hours daily. (R. at 89). She also sits in a reclining chair for four hours daily, though that is due in part to her pain. (*Id*. at 88). The ALJ did not consider these allegations. He may have thought that he was implicitly refuting what Plaintiff had told him when the ALJ noted in another part of the decision that she exercises regularly. (*Id*. at 47). Insofar as the ALJ intended that to address Plaintiff's fatigue, he overlooked that Plaintiff explained that she only exercises by walking for two blocks daily over a ten-minute

period. (*Id*. at 82). The ALJ never explained how such minimal activity showed that Plaintiff was not credible concerning her fatigue. Plaintiff never claimed that she was so tired that she was immobile; her point was that fatigue prevented her from working on a full-time basis.

In addition to doubting her credibility on fatigue, the ALJ was also skeptical about Plaintiff's claims concerning her depression, citing the fact that she had only been treated for it by Dr. Hajat instead of by a specialist. (R. at 46). At the hearing, however, the ALJ never asked Plaintiff to explain why she did not seek out more specialized care for her mental impairment. An ALJ is required to do so before construing a claimant's questionable treatment history against her credibility. *See* SSR 16-3p; *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment . . . can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The issue takes on additional significance here because Plaintiff claimed at the hearing that Dr. Hajat was an internist with "a secondary specialty in psychology." (R. at 77). That suggests that Plaintiff may have thought that she was receiving some form of specialized care for depression and anxiety. The ALJ's decision criticized Plaintiff at some length for that assumption. (*Id*. at 49). Plaintiff's subjective belief that Dr. Hajat had a secondary specialty in psychology might have explained why she did not consult a psychiatrist for further care. The ALJ was obligated to ask Plaintiff why she did not seek out a more qualified psychological expert.

An ALJ's failure to inquire into a claimant's treatment history does not always require remand when the ALJ goes on to discuss other reasons that adequately account for the credibility finding. *See Lott v.* Colvin, 541 F. App'x 702, 706 (7th Cir. 2013) (finding no error when the ALJ states other valid reasons for her finding). The ALJ tried to bolster his credibility assessment by stating that Plaintiff had never been hospitalized for depression or subjected to "involuntary treatment." (R. at 46). Such extreme treatment measures would almost certainly support a claim of severe depression if they were present. The fact that Plaintiff did not receive them is also potentially relevant because SSR 16-3p permits an ALJ to consider the absence of evidence on an issue. That said, merely noting that the record does not contain the kind of evidence the ALJ cited does not mean that he adequately explained why Plaintiff's claims were unbelievable. Claimants with depression do not necessarily have to undergo worst-case treatment scenarios like being committed to a psychiatric hospital in order to be credible. That is especially the case when, as here, a claimant does not allege the kind of extreme symptoms that might lead a reasonable person to think that hospitalization is in order. Even listing 112.04 (mood disorders) does not require hospitalization for a claimant to be presumptively disabled from depression at step three. That makes it difficult to understand why the ALJ thought involuntary treatment was critical at the credibility stage.

The ALJ tried to support his analysis further by citing the report of consulting psychologist Dr. Karr. Dr. Karr observed that Plaintiff had not displayed any "visible signs of physical distress, accompanying motor difficulties, tremors or restless-

ness" during his interview with her. (R. at 566). The ALJ reasoned that since motor agitation can be a sign of serious depression, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.04(A)(1)(e), the fact that it was absent during the consultation suggested that Plaintiff was not credible. But tremors and restlessness are not necessary symptoms of depression. The regulations state that it can also be accompanied by a depressed mood, sleep disturbances, limited activities, and fatigue. *Id.* at § 112.04(A)(1)(a)–(j). The ALJ failed to take into account that Dr. Karr noted some of these symptoms in his report. He stated, for example, that Plaintiff described sleep problems, prior suicidal ideation, a current withdrawal from activities, and persistent sadness. (R. at 566). Dr. Karr also described Plaintiff as "visibly dysphoric" and diagnosed her with a major depressive disorder and PTSD. (*Id.* at 568). Despite the absence of physical tremors, therefore, these conclusions suggest a mood disorder that was largely consistent with the symptoms that Plaintiff told the ALJ she experienced. The ALJ was required to account for all that Dr. Karr said on this topic before citing Plaintiff's physical condition to discount her credibility on the depression issue.

As noted earlier, Dr. Hajat stated in one of her treatment notes that Plaintiff's symptoms were controlled with medication. (R. at 761). The ALJ was entitled to cite that finding as part of his credibility analysis. Without more, however, the ALJ's reliance on Dr. Hajat's observation fails to account for the longitudinal record on Plaintiff's mental health. He seems to have assumed the treatment note meant that Plaintiff's symptoms were permanently controlled, or at least that they would have

been if she took her medication regularly. Yet the record strongly suggests that depression was a recurring problem for Plaintiff, whose symptoms came and went over time. Dr. Hajat prescribed medications such as Elavil, Paxil, and lorazepam from February 2000 to the time of the May 20, 2014 note that the ALJ cited. She also prescribed them on a sporadic basis instead of continually. This suggests that Plaintiff's symptoms waxed and waned. Dr. Hajat confirmed that point in her expert report by stating that Plaintiff's symptoms were "episodic." (*Id.* at 605). The ALJ should have been aware that "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). Thus the fact that medication was able to control Plaintiff's symptoms in May 2014 does not mean that Plaintiff was unbelievable about all of her depression claims.[8] The ALJ could have addressed the matter adequately at the hearing by asking Plaintiff to describe the degree to which medication had helped her symptoms over time, or why she went on and off antidepressant medications for several years. Without doing so, he could not rely on Dr. Hajat's treatment note to claim that everything that Plaintiff said on the topic was not credible

---

[8] The ALJ cited part of the record suggesting that Plaintiff functioned in a relatively normal manner despite her claims about depression. He cited pages 529–45 (Exhibit 8F) for the proposition that she was oriented and had a normal mood and affect. These pages, however, contains records from the Heart Care Centers of Illinois related to tests that Plaintiff underwent for dyspnea, chest pain, and syncope. Exhibit 8F provides no information on her mental condition.

The ALJ's oversight of this issue is further troubling in light of his step two finding that, unlike depression, bipolar disorder was a severe impairment.[9] (R. at 42). "The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see Kangail*, 454 F.3d at 629 (stating that "bipolar disorder is episodic"). Having found that Plaintiff suffers from bipolar disorder, however, the ALJ never discussed it at any other point in his decision. That is erroneous in itself since an ALJ is required to account for the combined effects of a claimant's severe and non-severe impairments at all stages of the sequential analysis. *See Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002). Assuming *arguendo* that Plaintiff suffers from bipolar disorder, the ALJ should have considered the effect that its fluctuating nature had on Plaintiff's depressive episodes instead of relying on one treatment note to find that she was not credible. His oversight of these issues means that the ALJ failed to build a logical bridge between the record and the finding that Plaintiff was not credible concerning her depression symptoms. *See Steele*, 290 F.3d at 942 ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.").

---

[9] It is difficult to determine how the ALJ went about reaching that conclusion. Neither Dr. Hajat nor Dr. Karr diagnosed Plaintiff with bipolar disorder. No other physician or psychologist appears to have made such a diagnosis either. The Court does not discuss the issue further because neither party addresses it. Since this case already requires remand, the ALJ shall clarify his basis for finding that Plaintiff suffers from bipolar disorder.

**D. The ALJ's RFC Assessment Is Erroneous**

The RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. It represents "that which a claimant can still do despite her physical and mental limitations." *Clifford*, 227 F.3d at 872 n.7. The ALJ found that Plaintiff could work at the sedentary level when various exertional restrictions were put in place. Those included only occasional pushing or pulling with the upper extremities, frequent overhead reaching, and frequent handling and fingering. (R. at 45). The ALJ posed that RFC to the VE, who testified that a person with the abilities the ALJ described could perform Plaintiff's past work as an office manager. The ALJ relied on that statement at step four to find that Plaintiff was not disabled. Accordingly, he did not proceed to step five.

Part of the ALJ's RFC assessment involved assigning weights to various expert reports. The state-agency physician Dr. Marion Panepinto issued a physical RFC in May 2013 that found Plaintiff could perform medium work. (R. at 105). The ALJ gave that opinion little weight because other evidence in the record showed that Plaintiff was more restricted in her physical functioning and could carry out only sedentary work. State-agency expert Dr. Lionel Hudspeth also issued a Psychiatric Review Technique that considered Plaintiff's mental disorders of depression and anxiety. (*Id.* at 103). He concluded that neither of these conditions constituted a severe disorder. The ALJ gave some weight to that conclusion but did not adopt it outright.

Treating physician Dr. Hajat submitted two opinions. One described Plaintiff's physical functioning in terms that are discussed more fully below. The ALJ gave some weight to Dr. Hajat's physical findings. He dismissed out of hand, however, her psychological opinion. Dr. Hajat stated that Plaintiff suffered from fatigue and a lack of concentration due to her anxiety. The treating physician thought that resulted in a poor ability to work at a consistent pace and only a fair capacity for understanding instructions, working around others without distraction, and completing a normal workday. (R. at 605–06). The ALJ relied, in part, on Dr. Karr's report to set aside Dr. Hajat's psychological conclusions, though he never assigned any specific weight to Dr. Karr's opinion.[10] Having credited Dr. Hudspeth to some degree, and having dismissed Dr. Hajat's psychological restrictions, the ALJ did not include any mental restrictions in Plaintiff's RFC.[11]

The regulations describe six factors that an ALJ should consider when weighing an expert medical report. These include the nature and length of the treating relationship, the medical expert's specialization, and the supportability from and consistency with other evidence. 20 C.F.R. § 404.1527(d)(1)–(6). A treating physician's

---

[10] An ALJ is required to weigh all the opinions submitted by medical experts. *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive."); *Craft*, 539 F.3d at 676 ("The ALJ is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding."). The ALJ is directed to weigh Dr. Karr's report on remand.

[11] Both Dr. Hudspeth and Dr. Hajat thought that Plaintiff had some form of anxiety disorder that was separate from her depression. Nevertheless, the ALJ never addressed the anxiety issue in his decision. To the degree that he swept both conditions under the sole diagnostic category of depression, the ALJ erred. The listings distinguish between mood disorders like depression (listing 112.04) and anxiety disorders (listing 112.06). The ALJ shall explain on remand whether Plaintiff's anxiety disorder constitutes a severe or non-severe impairment.

opinion is entitled to controlling weight when it is well supported by the record. Absent such a finding, however, the expert opinion cannot be rejected out of hand. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p.

The ALJ did not apply these factors adequately to Dr. Hajat's psychological opinion. He first claimed that Dr. Hajat's findings were inconsistent with those given by consulting psychologist Dr. Karr. That fails to address the issue in sufficient detail, however, because Dr. Karr never expressed any opinion on Plaintiff's mental RFC. Dr. Karr did not evaluate Plaintiff's ability to work around others, to work at a consistent pace, or to complete a normal workday without the fatigue that Dr. Hajat said was a result of Plaintiff's anxiety. The ALJ justified his reliance on Dr. Karr's report by claiming that it found that Plaintiff "demonstrated normal mood and affect with orientation times three." (R. at 49). To support that claim, the ALJ referred to pages 529–45 (Exhibit 8F) even though, as discussed earlier, that exhibit contains information from the Heart Care Centers of Illinois that is unrelated to Plaintiff's mental condition. Dr. Karr's actual report (*id.* at 565–68) says nothing about Plaintiff's orientation. Nor does it state that she had a normal affect. On the contrary, it notes that Plaintiff was "visibly dysphoric"; her affect was "congruent" with dysphoria; and she was "particularly tearful about her abuse." (*Id.* at 566,

568). The ALJ could not cite Dr. Karr as a ground for giving little weight to Dr. Hajat's psychological assessment without first accurately accounting for what Dr. Karr stated.

The ALJ also thought that Dr. Hajat's psychological opinion was at odds with her treatment notes. He stressed the May 2014 entry noting that Plaintiff's condition had improved on medication. (*Id*. at 713, 761). The ALJ also cited a second entry dated November 2013. For the reasons discussed earlier, however, the ALJ's reliance on temporary improvements in Plaintiff's mood ignored the fluctuating nature of her condition, which the report itself describes as "episodic." (*Id*. at 605).

The ALJ's third reason for discounting Dr. Hajat's psychological opinion was that she was not a psychologist or a psychiatrist. It is true that the regulations permit an ALJ to "give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). But that does not mean that the ALJ could rely on Dr. Hajat's lack of certification as a psychiatrist without first accounting for other issues that accompanied the treatment record. Dr. Hajat stated in her report that she based her conclusions on "observation and psychological assessment over [the] last 15 years." (R. at 606). The regulations require the ALJ to consider that this made Dr. Hajat far more familiar with Plaintiff's mental (and physical) functioning than any other source. *See* 20 C.F.R. § 404.1527(d)(2). Even though she was not a psychiatrist, Dr. Hajat was still a qualified medical source whose opinion

could not be set aside without explaining why her extensive treatment history with Plaintiff did not provide greater support for her opinion.

The issue was important under these facts because Dr. Hajat was the sole medical source who both issued an opinion on Plaintiff's mental restrictions and examined her. The state-agency psychologist Dr. Hudspeth, whom the ALJ thought was more reliable than Dr. Hajat, never examined Plaintiff. That raises threshold concerns because ALJs are ordinarily required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1); *see Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ can always give greater weight to nonexamining sources than to treating sources when the record supports such a conclusion. But the ALJ did not adequately explain why that was the case here. As with the credibility issue, the ALJ said that Dr. Hudspeth was more reliable than Dr. Hajat because Plaintiff had never been hospitalized or treated by a specialist. (R. at 49). That falls short as a reasoned analysis for the reasons discussed above. Indeed, it is even less relevant to Dr. Hudspeth's report than it was to the credibility assessment. Dr. Hudspeth's only conclusion about Plaintiff's condition was that neither depression nor anxiety constitutes a severe impairment. The threshold for finding a "severe" impairment is very low because a disorder need only pose more than a minimal limitation on a claimant's functioning to be severe. *See Curvin*, 778 F.3d at 649; *Ishmael v. Barnhart*, 212 F. Supp. 2d 865, 870 (N.D. Ill. 2002) (noting that this standard poses a minimal threshold). The ALJ never explained why Plaintiff would need to receive

extraordinary treatment like psychiatric hospitalization to meet such a standard. As for not consulting a psychiatrist, Plaintiff told the ALJ that she thought Dr. Hajat had some form of specialization in treating mental disorders. The ALJ should have clarified the basis of Plaintiff's assumption on this issue before finding that the nonexamining expert Dr. Hudspeth was more credible than Dr. Hajat.

The ALJ made a final attempt to reject Dr. Hajat's psychological assessment by noting that she and Plaintiff had previously worked together in a medical office. He concluded from this that Dr. Hajat was biased because she had a "motivation to support [Plaintiff's] claim, with an element of sympathy for her former co-worker." (R. at 49). An ALJ may consider a treating physician's potential sympathy for a claimant when deciding the appropriate weight to give the expert's opinion. *See*, *e.g.*, *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). What an ALJ cannot do is to base his finding on speculation. *See Moss*, 555 F.3d at 560 ("An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views[.]"); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) ("[T]here is no presumption of bias in a treating physician's disability opinion."). Treating physicians and claimants always have a pre-existing relationship. The ALJ must therefore state an evidentiary basis for finding that the expert's opinion is biased. The ALJ did not do so in this case, other than to note that the Plaintiff and Dr. Hajat worked in the same office. In reality, the ALJ knew very little about Plaintiff's work situation. He never asked her to clarify how many other doctors or staff worked at the office, how frequently Plaintiff saw Dr. Hajat at work, or even whether they had any connection outside of

their long-standing treatment relationship. That provided no basis from which the ALJ could infer that Dr. Hajat's report reflected anything but her professional expert opinion.

In addition to the mental RFC, Dr. Hajat also assessed Plaintiff's physical RFC. She found that Plaintiff could sit and stand for less than two hours a day; could never balance, crouch, or crawl; could occasionally push or pull and do fine manipulation with her hands; and could frequently perform gross manipulation. (R. at 607). The ALJ adopted all of these restrictions in his RFC except for the finding that Plaintiff could perform fine manipulation only occasionally. He found instead that she could so frequently. (*Id*. at 45). The distinction between occasional and frequent fine manipulation was critical to the ALJ's decision. The VE testified that an individual with Plaintiff's RFC could perform her past relevant work if she could finger frequently. She would not be able to do so if she could only do fine manipulation occasionally. (*Id*. at 93–94). Had the ALJ adopted Dr. Hajat's opinion on this issue, therefore, he would not have been able to conclude at step four that Plaintiff was not disabled.

The ALJ never built a logical bridge from the record to his conclusion on Plaintiff's ability to carry out fine manipulation frequently. First, the ALJ misstated what Dr. Hajat's expert report found. He said that she had concluded that Plaintiff could "perform fine manipulation." (R. at 49). The critical issue, however, was the degree to which Plaintiff could do so. The ALJ overlooked that Dr. Hajat limited her to only occasional fingering. The ALJ could not have adequately explained why he

disagreed with Dr. Hajat on this point without first accurately accounting for what she said.

Second, the ALJ had no other physical RFC on which to base his own assessment. The only physical RFC other than Dr. Hajat's came from the nonexamining expert Dr. Panepinto, but the ALJ rejected that RFC for the reasons stated earlier. In addition, no medical expert appeared at the hearing. That left the ALJ without an RFC assessment that contradicted Dr. Hajat's finding on fine manipulation. *See Bailey v. Barnhart*, 473 F. Supp. 2d 822, 839 (N.D. Ill. 2006) ("The ALJ simply cannot do this."); *Kelly v. Colvin*, No. 14 C 1086, 2015 WL 4730119, at *8 (N.D. Ill. Aug. 10, 2015) ("The ALJ is prohibited from constructing his own RFC after he has rejected the RFC assessments in the record.").

Third, the ALJ failed to explain what evidence supported his conclusion that Plaintiff could do fine manipulation frequently. The absence of an expert opinion on an RFC does not require remand when an ALJ goes on to explain how the record leads to her own RFC assessment. *See* SSR 96-8p (stating that the RFC is "an administrative finding of fact" that is based on all evidence in the record). In this case, however, the only potential medical evidence on the fingering issue involves a May 14, 2013 consultative report given by Dr. M.S. Patil. He found upon examination that Plaintiff had no fine or gross manipulative limitations in either hand. (R. at 572). The ALJ cited that as part of his record review, but he did not weigh Dr. Patil's report or explain why it contradicted Dr. Hajat's report. Both Dr. Patil and Dr. Hajat were internal medicine specialists, so the ALJ could not have preferred

Dr. Patil based on his expertise. Dr. Patil's one consultation with Plaintiff also made him significantly less familiar with Plaintiff's condition than Dr. Hajat was after treating her for 15 years. Moreover, the ALJ's finding that Plaintiff could frequently use her fingers clearly disagrees with Dr. Patil's conclusion that no limitations were present at all. "Frequent" is defined by the Social Security Agency as the ability to perform an activity "one-third to two-thirds of the time." SSR 83-10; *see Bone v. Colvin*, No. 13-2698, 2014 WL 7339019, at *10 n.2 (D.S.C. Dec. 23, 2014). That means that the ALJ thought that Plaintiff might be unable to carry out fine manipulation as much as two-thirds of the time, far less than what Dr. Patil stated.

The ALJ never explained how he went about reaching his conclusion. Without doing so, the ALJ essentially charted a middle course between Dr. Patil's and Dr. Hajat's assessments without an evidentiary basis. That was erroneous. *See Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) ("The ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis."). An ALJ's decision cannot be upheld when he fails to explain the basis of his reasoning even when the record supports the actual RFC assessment. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *Ruiz v. Barnhart*, 518 F. Supp. 2d 1007, 1022 (N.D. Ill. 2006) ("Even if there is enough evidence in the record to support the ALJ's ultimate RFC determination, the ALJ committed significant logical and legal errors in reaching her RFC determination by due to her lack of analysis."). The ALJ is always required to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence

(e.g., daily activities, observations)." SSR 96-8p. The ALJ's failure to do so, combined with his erroneous consideration of Dr. Hajat's reports, requires remand.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [13] is **GRANTED**. The ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405.

E N T E R:

Dated: October 25, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge